IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| AUGUST HEALTHCARE GROUP, LLC *dba* SAINT MICHAEL'S MEDICAL RESPONSE,<br><br>          Plaintiff,<br>     v.<br><br>THOMAS M. MANGLONA, individually and in his personal capacity as Fire Chief of the Department of Public Safety, MICHAEL MANIBUSAN TAKAI, JOHN BENEDICT TAISAKAN PELISAMEN, MARIANAS GLOBAL VENTURES, LLC *dba* PRIORITY CARE, JOAQUIN CAMACHO MANGLONA, and JOHN DOES 1-10,<br><br>          Defendants. | Case 1:12-CV-00008<br><br>**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**I. INTRODUCTION**

August Healthcare Group, LLC *dba* St. Michael's Medical Response ("St. Michael's") brings this action against Thomas M. Manglona ("Thomas"), Joaquin C. Manglona ("Joaquin"), Marianas Global Ventures, LLC *dba* Priority Care ("Priority Care"), and two former St. Michael's employees, John T. Pelisamen and Michael M. Takai, for alleged violations of its civil rights under 42 U.S.C. § 1983 and various state tort and contract claims. (Compl., ECF No. 2 at 1–2.) St. Michael's alleges that Thomas conspired with his cousin, Joaquin, to illegally compete with St. Michael's patient transportation services. (*Id.*)

Presently before the Court is Plaintiff St. Michael's Motion for Preliminary Injunction. (ECF No. 1.) After considering the relevant filings, the evidence presented, and the oral arguments

1

presented by counsel for the parties on May 29, 2012, the Court finds that St. Michael's has not established its entitlement to a preliminary injunction.

## II. BACKGROUND

In a Complaint filed on April 27, 2012 (ECF No. 2), St. Michael's alleges that Thomas conspired with his cousin, Joaquin, to illegally bring down St. Michael's in order to establish his own competing patient transportation services or ambulance company called Priority Care. (*Id.*) Thomas did this by exceeding his statutory and regulatory authority as the Emergency Medical Services ("EMS") Coordinator, Acting Fire Chief, and Fire Chief of the Department of Public Safety ("DPS") Fire Division of the Commonwealth of the Northern Mariana Islands ("CNMI") by (1) interfering with St. Michael's business licenses; (2) providing materially false information regarding CNMI statutes and regulations to companies overseeing St. Michael's Medicare compliance; (3) requiring CNMI certifications that did not and still do not exist; and (4) treating other private ambulance companies and government ambulances differently. (Compl. at 2.) The remaining defendants conspired with Thomas to harm St. Michael's business by (1) violating their contractual agreements not to compete; (2) violating their contractual agreements not to solicit; (3) interfering with St. Michael's contracts; (4) stealing proprietary information; and (5) stealing confidential patient medical records. (*Id.*)

On the basis of the allegations outlined above, Plaintiff brings eight causes of action against Defendants. The first four causes of action are against Defendant Thomas only: (1) Violation of Due Process–Licenses, 42 U.S.C. § 1983; (2) Violation of Due Process – Provider Transaction Access Number ("PTAN"), 42 U.S.C. § 1983; (3) Malicious Prosecution, Due Process Violation under §

1983; and (4) Violation of Equal Protection, 42 U.S.C. § 1983. The remaining causes of action are: (5) Conspiracy against Thomas, Joaquin, Priority Care, Takai, and Pelisamen; (6) Breach of Contract against Takai and Pelisamen; (7) Tortious Interference with Existing Contract against Priority Care; and (8) Conspiracy and Concert of Action for Tortious Interference against all Defendants except Thomas.

In its Motion for Preliminary Injunction, St. Michael's requests that the Court issue a preliminary injunction to continue until the final determination of the case, restraining:

1. Pelisamen from working for Priority Care;
2. Pelisamen from soliciting, offering kickbacks, bribes, or gratuities to St. Michael's customers;
3. Takai from working for Priority Care;
4. Takai from soliciting, offering kickbacks, bribes, or gratuities to St. Michael's customers;
5. Priority Care from soliciting, offering kickbacks, bribes, or gratuities to St. Michael's customers;
6. Priority Care from transporting and collecting fees from current and former St. Michael's customers; and
7. Joaquin Manglona from contacting and soliciting St. Michael's current customers.

(ECF No. 1.)

### **III. JURISDICTION**

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the case in controversy involves federal questions, and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

/ /

/

## IV. STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). In determining whether to grant a preliminary injunction, the district court applies a four-pronged test. The plaintiff must establish that (1) plaintiff is likely to succeed on the merits, (2) plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) the balance of equities tips in plaintiff's favor, and (4) a preliminary injunction is in the public interest. *Winter,* 555 U.S. at 20. The plaintiff must "make a showing on all four prongs." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Alternatively, if the plaintiff can satisfy the second and fourth prongs, the district court may issue a preliminary injunction if "serious questions going to the merits" have been raised and "the balance of hardships tips sharply in the plaintiff's favor." *Cottrell*, 632 F.3d 1134–1135 (*quoting Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

## V. FINDINGS OF FACT

At the May 29, 2012 hearing, the Court received the testimonies of Defendants Takai, Pelisamen, and St. Michael's Director of Operations Derek T. Hocog. Based upon the pleadings, the evidence and testimony received at the hearing, the Court makes the following Findings of Fact:

1. St. Michael's is a limited liability company registered in the CNMI with its principal place of business in Saipan. (Compl. ¶ 3.) St. Michael's was formed in 2007 by Joseph C. Santos ("Santos") as the CNMI's first, and until recently only, private ambulance company. (*Id.* ¶¶ 12, 15.) It is in the business of transporting patients to and from medical treatment facilities in the CNMI. (*Id.* ¶ 16; Santos Decl. ¶ 4, ECF No. 11-4.)

2. Defendant Thomas was at all times relevant hereto the Fire Chief of DPS. (*Id.* ¶ 4.) Thomas is a citizen of the United States and a resident of the CNMI. (*Id.*)

3. Defendant Takai is a citizen of the United States and a resident of the CNMI. (*Id.* ¶ 5.) Takai is an Emergency Medical Technician ("EMT") and received his certification as a Nationally Registered Paramedic before he began work for St. Michael's. (Takai Decl. ¶ 2, ECF No. 8-1.) He had an extensive career in the field of both emergency and non-emergency medical transport and was previously employed by the CNMI Fire Department for over 25 years. (*Id.* ¶ 3.) On July 5, 2009, St. Michael's hired Takai as an EMT and Ambulance Attendant. (Compl. ¶¶ 104-105.)

4. Defendant Pelisamen is a citizen of the United States and a resident of the CNMI. (*Id.* ¶ 6.) Pelisamen was previously employed by the Fire Department for almost three years and had obtained his certification in Emergency Vehicle Operation before he began work for St. Michael's. (Pelisamen Decl. ¶ 2, ECF No. 6-3.) Around October or November 2008, St. Michael's hired Pelisamen as an Ambulance Operator. (*Id.* ¶ 3; Hocog May 29 Testimony.)

5. Defendant Priority Care is a CNMI limited liability company with its principal place of business in Saipan. (Compl. ¶ 7.)

6. Defendant Joaquin is the President of Priority Care. (Joaquin Decl. ¶ 2, ECF No. 6-1.) Joaquin is a citizen of the United States and a resident of the CNMI. (Compl. ¶ 8.) Joaquin established Saint Jude Supplies and Services, LLC in March 2010. (*Id.* ¶ 100.) St. Jude eventually became Priority Care, St. Michael's only private competitor. (*Id.* ¶ 101.)

7. At the time of St. Michael's formation, there were no CNMI laws that provided for the regulation of private ambulances. (*Id.* ¶ 24.) In May 2008, St. Michael's attempted to secure certification from DPS, but DPS declined the certification. (*Id.* ¶¶ 20–21.)

8. Subsequently, St. Michael's applied for and received its Medicare service provider number and transported its first patient in June 2008. (*Id.* ¶ 28.)

9. In March 2009, after St. Michael's requested the renewal of registration for one of its existing ambulances and registration of a new ambulance, DPS informed St. Michael's that the registration was only for commercial vans rather than ambulances. (*Id*. ¶¶ 33–39.) DPS told St. Michael's that if it did not remove all emergency lighting, sirens, decals, the "star of life" mark, and lettering such as "AMBULANCE" from its vehicles, the registration on those vehicles would be suspended. (Letter from DPS, Compl. Ex. A, ECF No. 2-1.)

10. On August 24, 2009, Commissioner Santiago Tudela sent a letter to the Acting Secretary of the Department of Public Health claiming that the DPS Fire Division is the "sole provider" of emergency medical services in the CNMI and that St. Michael's was not licensed or certified in the CNMI because DPS had not certified it. (Letter from Tudela, Compl. Ex. C, ECF No. 2-1.)

11. On November 10, 2010, St. Michaels received a letter from Palmetto GBA, the Medicare health insurance administrator, indicating that St. Michael's Medicare service provider number was revoked because St. Michael's was "not licensed in the [CNMI]." (Palmetto Letter, Compl. Ex. D, ECF No. 2-1.)

12. Medicare accounts for a substantial percentage of St. Michael's business. (Compl. ¶ 72.)

13. On May 19, 2011, Thomas sent a letter to DPS Commissioner Ramon Mafnas to reaffirm the Fire Division's findings that St. Michael's (1) has not complied with the law; (2) employees are not certified and licensed to practice as EMTs in the CNMI; and (3) vehicles are only registered for commercial purposes and not for emergency response or as an ambulance service provider. (Letter from Thomas, Compl. Ex. E, ECF No. 2-1.)

14. Subsequently, around June 2011, Palmetto reinstated St. Michael's Medicare service provider number. (Compl. ¶ 90–91.)

15. Both Pelisamen and Takai were hired as at-will employees. (Hocog May 29 Testimony.) As part of their employment, both Takai and Pelisamen had access to St. Michael's customer lists, client information, and medical records. (Compl. ¶ 107–109.)

16. As part of their employment with St. Michael's, both Takai and Pelisamen received some training at St. Michael's expense. (Hocog Decl. ¶¶ 17–18.)

17. On August 11, 2009, and September 2, 2011, Pelisamen and Takai respectively signed a Confidentiality and Non-Disclosure Statement (hereafter, "NDS"). (Reply, Exs. B and A, ECF No. 11-3 and 11-2.) The NDS defined confidential information as including patient information and customer lists. It provided that "all personnel are required to respect the confidentiality of all proprietary or confidential information and are expected to not disclose such information to individuals outside" of Saint Michael's. It further provided that St. Michael's "may require our personnel to sign a non-disclosure *agreement* as a condition of employment." (*Id.,* emphasis added). Finally, "personnel who improperly use or disclose any confidential information will be subject to disciplinary action, up to and including termination." (*Id.*) St. Michael's never required Takai or Pelisamen to sign a separate non-

7

disclosure agreement. (Hocog May 29 Testimony.) Furthermore, the NDS does not provide that the employees are bound by the NDS after employment. (Hocog May 29 Testimony.) St. Michael's admitted that by virtue of the NDS, a former employee would be able to use the confidential information as soon as one month after their employment ended. (*Id.*)

18. At some point during their employment, Takai and Pelisamen received an employee handbook. However, there is no information in that handbook that is considered private or confidential. (Hocog May 29 Testimony.)

19. On October 27, 2011, Pelisamen signed an Employee Non-Competition Agreement. (Compl. Ex. G, ECF No. 2-1, hereafter, "Non-Compete Agreement.") The Non-Compete Agreement provides that in consideration and as a condition of Pelisamen's employment with St. Michael's, from the time of the signing of the agreement until one year after the date of his termination, Pelisamen is not to engage in any business activity in competition with any of the products or services provided by St. Michael's in the CNMI or Guam. (*Id.*) Pelisamen further agreed that during that period, he would not solicit or do business with any present or prospective St. Michael's customer. (*Id.*)

20. After signing the Non-Compete Agreement, Pelisamen's at-will employment did not change in any way. (Pelisamen Decl. ¶ 5.) His duties and position remained the same as an Ambulance Operator, he was never sent for additional trainings, seminars, or conferences, and his salary was never increased. (*Id.*) Because he remained an at-will employee, he could have been terminated with or without cause the very next day after signing the Non-Compete Agreement. (Hocog May 29 Testimony.) Furthermore, Pelisamen never received training after the signing of the Non-Compete Agreement. (*Id.*) Takai also never received any

training after September 2011, or after the date St. Michael's claims Takai signed the Non-Compete Agreement. (*Id.*)

21. Pelisamen was terminated by St. Michael's on January 30, 2012, three months after signing the Non-Compete Agreement. (Pelisamen Decl. ¶¶ 4, 5.)

22. Takai has declared in a sworn affidavit that he never signed a Non-Compete Agreement. (Takai Decl. ¶ 7.) However, St. Michael's Director of Operations declared in a sworn affidavit that he personally inspected and made sure Takai returned a signed Non-Compete Agreement. (Hocog Decl. ¶ 16, ECF No. 11-5; Hocog May 29 Testimony.) St. Michael's does not have written record of a Non-Compete Agreement signed by Takai. (Hocog May 29 Testimony.) St. Michael's has a signed Non-Compete Agreement with every other employee except Takai. (Hocog May 29 Testimony.)

23. After they were terminated from St. Michael's, Takai and Pelisamen both began working for Priority Care. (Compl. ¶¶ 111–113.)

24. St. Michael's has since lost three customers to Priority Care. (Compl. ¶ 118; Santos Decl. ¶ 18.) St. Michael's stipulated that the amount of monetary loss due to the loss of customers can be reasonably calculated. (May 29 hearing.)

25. Saipan is a small community, and it is easy to know who utilizes the services of St. Michael's or the Fire Department. (Pelisamen Decl. ¶ 6.) The customer's schedule is posted on a board and everyone who passes by the board can see the customers' last names and the schedule for their pickup. (Pelisamen Decl. ¶ 6; Santos Decl. ¶ 12.) This board is in an area reserved for authorized personnel only. (Hocog Testimony.) St. Michael's customers could easily be identified during transport to and from health clinics and their residence.

26. If Pelisamen is enjoined from working for Priority Care, he will suffer significant hardship and it will be difficult for him to find another job in his field. (Pelisamen Decl. ¶¶ 9–10.)

27. If Takai is enjoined from working for Priority Care, he will suffer significant hardship and it will be difficult for him to find another job in his field. (Takai Decl. ¶ 12.)

## VI. CONCLUSIONS OF LAW

### A. RESTRAINING PELISAMEN AND TAKAI FROM WORKING FOR PRIORITY CARE

In support of its request for a preliminary inunction restraining Pelisamen and Takai from working for Priority Care, St. Michael's claims that Takai and Pelisamen breached their Non-Disclosure Statement and Non-Compete Agreements with St. Michael's. (Reply at 2.)

The Non-Disclosure Statement ("NDS") signed by Takai and Pelisamen specifically states that St. Michael's "may require our personnel to sign a non-disclosure *agreement* as a condition of employment."  (emphasis added).  Further, the NDS provides that violations can result in disciplinary action, "up to and including termination."  These statements suggest that if the NDS was an enforceable agreement against Takai and Pelisamen, it would be binding only during the time of their employment.  In fact, St. Michael's admitted that by virtue of the NDS, a former employee would be able to use the confidential information as soon as one month after their employment ended.  Accordingly, St. Michael's has not demonstrated that the NDS was indeed an agreement, let alone that it was binding beyond the period of employment.

With respect to Defendant Takai, St. Michael's has not produced a signed Non-Compete Agreement with him, and Takai testified under oath that he never signed such an agreement.  As for Defendant Pelisamen, he did sign a Non-Compete Agreement.  He, however, contends that he did

10

not receive anything of value in exchange for the agreement, and therefore it lacks consideration and enforceability against him.  (Pelisamen's Opp'n at 5-8.)

There is no specific law, statute, or custom in the CNMI governing covenants not to compete.  In the absence of written law or local customary law, the CNMI looks to the United States common law as expressed in the Restatements.  *See* 7 N. Mar. I. Code § 3401.  The parties agree that the Restatement (Second) of Contracts (hereinafter "Restatement") controls in the Commonwealth and applies in this case.  (Pelisamen's Opp'n at 7, ECF No. 7; St. Michael's Reply at 13, ECF No. 11.)  However, they refer to different sections of the Restatements for their positions.  St. Michael's cites to Restatement Section 188 (Ancillary Restraints on Competition) for the contention that the Restatement explicitly allows covenants not to compete to be ancillary to an at-will contract.  (Reply at 13).[1]  In particular, it relies on Reporters Notes to Comment a, p. 5 of § 188.  *Id.*

Pelisamen, on the other hand, cites to Washington case law that looks to Restatement Section 71 for a definition of consideration in a noncompete agreement.  (Pelisamen's Opp'n at 6–8, *citing Labriola v. Pollard Group, Inc.,* 152 Wash. 2d 828, 836 (Wash. 2004) and *Schneller v. Hayes,* 176 Wash. 115, 118 (1934)).  He relies on Washington case law for the contention that absent

---

[1] Section 188 of Restatement (Second) of Contracts provides as follows:
(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if
(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or
(b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.
(2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:
(a) a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold;
(b) a promise by an employee or other agent not to compete with his employer or other principal;
(c) a promise by a partner not to compete with the partnership.
Restat 2d of Contracts, § 188 (1981).

independent consideration, a non-compete agreement signed several months, let alone several years, after the start of the at-will employment is invalid. *Id.*

At this stage of the proceedings, this Court finds that the application of Section 188 of the Restatement is sufficient to address St. Michael's request for a preliminary injunction and saves the issue of consideration for another day.  Section 188(1)(b) states, "A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship *is unreasonably in restraint of trade if* . . . the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public."  Restat (Second) of Contracts § 188 (1981).

Furthermore, under the third prong of the test for a preliminary injunction, the Court must balance the harm to defendants or other interested parties resulting from granting an injunction against the harm to plaintiffs from not doing so.  *Winter*, 555 U.S. at 24.  In this case, the balance of equities tips in Pelisamen and Takai's favor with respect to their continued employment with Priority Care.

Here, both men testified as to their financial responsibilities and how their inability to work would put an extreme financial burden on their families.  There are no other private medical service providers on Saipan to hire employees with their specialized skills.  An injunction that bars Pelisamen and Takai from working for Priority Care would deprive the men of the ability to earn their livelihood in a highly specialized sector of health care on Saipan.  *See* Restatement (Second) of Contracts § 188, comment C.[2].    Furthermore, the public will be harmed if enjoining Takai and

---

[2] *Harm to the promisor and injury to the public*.  Even if the restraint is no greater than is needed to protect the promisee's interest, the promisee's need may be outweighed by the harm to the promisor and the likely injury to the public…  In the case of a post-employment restraint, the harm caused to the employee may be excessive if the restraint inhibits his personal freedom by preventing him from earning his livelihood if he quits; the likely injury to the public may be too great if it is seriously harmed by the impairment of his

Pelisamen from working for Priority Care reduces Priority Care's ability to serve its customers to the point of removing St. Michael's only competitor from competition. *Id.*

On the other hand, St. Michael's claims that Priority Care, through Takai and Pelisamen, are using their proprietary customer list to unfairly compete with St. Michael's. However, St. Michael's admits to having lost only three customers to Priority Care through the alleged use of the customer list. Furthermore, as discussed below, its customer list is something that may be determined by Priority Care without Takai and Pelisamen's assistance. Thus, the harm to St. Michael's if the injunction is denied pales in comparison to the harm to Pelisamen and Takai if the injunction is granted. Accordingly, the preliminary injunction to restrain Pelisamen and Takai from working for Priority Care is DENIED.

### B. RESTRAINING PRIORITY CARE FROM SERVICING OR SOLICITING ST. MICHAEL'S CUSTOMERS.

St. Michael's remaining request for an injunction is to restrain Priority Care, its employees (including Defendants Pelisamen and Takai), and associates from offering kickbacks, bribes, or gratuities, transporting, collecting fees, or otherwise servicing and soliciting St. Michael's customers. (ECF No. 1 at 13–14.) This request stems from the allegation that Defendants misappropriated St. Michael's customer list. (Reply at 2.)

Under the second prong of the test, plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. *Flexible Lifeline Systems, Inc. v.*

---

economic mobility or by the unavailability of the skills developed in his employment. Restat. 2d of Contracts, § 188 comment c.

*Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (*citing Winter*, 555 U.S. at 22).  In addition to showing that irreparable injury is likely, Plaintiff must also establish a causal connection between the alleged irreparable harm and the action the moving party seeks to enjoin.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011). St. Michael's therefore must show that Priority Care is using its customer list or that the hiring of Pelisamen and Takai is the cause of the alleged harm.

St. Michael's argues that because Defendants Takai and Pelisamen have memorized its customer list and patient information, which it claims is the heart of its business, and because the Priority Care Defendants continue to use the information, St. Michael's has suffered irreparable harm. (Mot. at 12; Reply at 10.)  It cites to *Campbell Soup Co. v. ConAgra, Inc.* for the proposition that "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." 977 F.2d 86, 92–93 (3rd Cir. 1992).  It also cites to *North Atlantic Instruments, Inc. v. Haber* for the contention that loss of trade secrets cannot be measured in money damages.  188 F.3d 38, 49 (2nd Cir. 1999).  Not only are these cases not binding on this Court, they would only help St. Michael's argument if the customer list alleged to have been taken qualifies as a trade secret.

St. Michael's relies on case law that undermines its own position: "The subject matter of a trade secret must be secret.  Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  (Reply at 3, citing *Clark v. Bunker,* 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting Restatement of Torts § 757).)  St. Michael's claims that it guards its customer list very carefully, providing only partial access to certain employees and making all employees sign non-disclosure agreements. (Reply at 4.)  However, these precautions do not save it from the fact that the names of customers may not be a secret at all.

While a customer list and data can be considered trade secrets, Defendants make a convincing argument that Saipan is such a small community that the names of those needing healthcare transportation services would be public knowledge.[3] (Priority Care Opp'n at 4.) It would be easy to know who utilizes the services of St. Michael's or the Fire Department by soliciting others or merely observing the customers transported by St. Michael's or the Fire Department to the one public hospital or the few private clinics on island. (Priority Care Opp'n at 4.) Therefore, the list of customers is not necessarily a trade secret in the industry. Accordingly, St. Michael's has failed to demonstrate with facts how denial of a preliminary injunction will likely cause it irreparable harm or that the customer list could was even a trade secret.

In addition, St. Michael's argued at the hearing that even if the reasons that the customers left St. Michael's and joined Priority Care are unknown, damages due to the loss of their customers could still be reasonably calculated. It concedes that it can calculate how much loss it has incurred for specific customers who have left them since Priority Care started its business. Any harm (or loss of business) that is caused during the period of litigation may be remedied by monetary damages and a permanent injunction against the Defendants at the final determination of the case**.** *See Sampson v. Murray,* 415 U.S. 61, 90 (1974). As an injunction may not issue without a showing of irreparable harm, the Court need not proceed to the other factors. Accordingly, the remaining requests for preliminary injunction against Defendants are DENIED.

---

[3] "Some of the factors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Walker v. University Books, Inc.,* 607 F.2d 859, 865 n.2 (9th Cir. 1979) (quoting Restatement of Torts §757 comment b.)

## VII. CONCLUSION

Notwithstanding whether Plaintiff St. Michael's is likely to succeed on the merits of its claims, Plaintiff has not shown that it will likely suffer irreparable harm if the injunction is not granted.  Further, the balance of hardships weighs in favor of Defendants.  Plaintiff has failed to demonstrate that it is entitled to a preliminary injunction. Accordingly, Plaintiff's Motion for Preliminary Injunction is DENIED.

**SO ORDERED** on October 12, 2012.

_____
RAMONA V. MANGLONA, Chief Judge